# Steve Zissou & Associates

42-40 Bell Boulevard | Suite 302 | Bayside | New York | 11361 | 718.279.4500 | stevezissou@stevezissouesq.com

February 16, 2026

**BY ECF**

The Honorable Joan M. Azrack
United States District Court
100 Federal Plaza
Central Islip, New York 11722

      Re:    *United States of America v. Akeem Chambers*, Case No. 23 Cr. 157 (JMA)

Your Honor,

Defendants Akeem Chambers, Jonathan Vazquez, and Jerell Shaw respectfully request that the Court conduct a hearing, pursuant to *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993) and its progeny, to assess the reliability and admissibility of firearms comparison testimony the Government intends to offer through its disclosed experts, Jonathan Fox (Nassau County Medical Examiner"s Office, Forensic Science Division) and FBI Special Agent Bryce Ziegler (Firearms/Toolmarks Unit). The defense requests that this hearing be held before these witnesses testify.

This motion is filed in the context of a RICO trial in which firearms comparison evidence serves as the connective tissue between predicate acts spanning multiple years and locations. The Government's theory depends on linking cartridge casings recovered at different crime scenes to the same firearms—and by extension, to the defendants. The reliability and permissible scope of this expert testimony is therefore of central importance to the defense.

The defense does not seek blanket exclusion of all firearms examination testimony. Rather, the defense requests that the Court: (1) evaluate whether the methodology employed by these examiners meets the reliability requirements of Rule 702 as amended in December 2023; (2) determine the permissible scope of the examiners' conclusion language; and (3) require disclosure of error rates, limitations, and potential sources of bias.

**The 2023 Amendment to Rule 702
Demands Heightened Scrutiny of Forensic Testimony**

Effective December 1, 2023, Federal Rule of Evidence 702 was amended to clarify that expert testimony must "reflect[] a reliable application of the principles and methods to the facts of the case." The Advisory Committee Notes state that the amendment was prompted by the

Committee's concern that courts were "applying the wrong standard"—specifically, that "judges have been reluctant to find that the plaintiff has not satisfied the admissibility standard." *See* Fed. R. Evid. 702, Advisory Comm. Note (2023 Amendment).

The Committee identified forensic evidence as a particular area of concern. The changes in the amendment were designed to ensure that trial courts fulfill their gatekeeping function by making "a preponderance determination on the admissibility requirements set forth in the rule" rather than leaving reliability questions to the jury. *Id.* Federal courts are now applying this tightened standard with increasing frequency, as "[t]he Advisory Committee on Evidence Rules proposed the changes in response to court decisions that admitted expert testimony too liberally." *In re Terrorist Attacks on September 11, 2001*, Case No. 03-MD-01570 (GBD)(SN), 2024 U.S. Dist. LEXIS 225265, at *6–7 (S.D.N.Y. Dec. 11, 2024).

The 2023 amendments "reflect an intent to empower courts to take seriously their roles as gatekeepers of expert evidence." *United States v. Diaz*, No. 24 Cv. 32 (MV), 2024 U.S. Dist. LEXIS 31792, 2024 WL 758395, at *5 (D.N.M. Feb. 23, 2024) (noting that "jurors may lack the specialized knowledge" to evaluate the quality of a witness's opinion and its limitations, and thus the court must not presume expert testimony admissible and relegate issues of reliability to cross-examination). Courts must withhold endorsement from expert witnesses who fail to meet Rule 702's standards. *In re Terrorist Attacks on September 11, 2001*, 2024 U.S. Dist. LEXIS 225265, at *7.

Firearms comparison evidence is squarely in the crosshairs of these amendments. As the Southern California Law Review observed, firearms evidence has become "the most prominent testing ground for the 2023 amendments to the Federal Rules of Evidence, designed to tighten judicial review of experts more generally, but with a focus on forensic evidence more specifically." Brandon L. Garrett & Nicholas Scurich, *Judging Firearms Evidence*, 97 S. Cal. L. Rev. (2024) at 105.

## The Scientific Foundation of Firearms Comparison Is Disputed and Incomplete

A. <u>The NAS and PCAST Reports</u>

In 2009, the National Research Council of the National Academy of Sciences issued its landmark report, *Strengthening Forensic Science in the United States: A Path Forward*. The NAS concluded that "sufficient studies have not been done to understand the reliability and repeatability of the methods" of firearms identification, and that "the validity of the fundamental assumptions of uniqueness and reproducibility of firearm-related toolmarks has not yet been fully demonstrated." NAS Report at 3, 154 (2009).

In 2016, the President's Council of Advisors on Science and Technology ("PCAST") issued its own report, *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods*. PCAST found that "firearms analysis currently falls short of the criteria for foundational validity, because there is only a single appropriately designed

study to measure validity and estimate reliability." PCAST Report at 112. That one study—the Ames study (Baldwin et al., 2014)[1]—found a false positive error rate of approximately 1.5% on conclusive examinations. *Id.*

PCAST recommended that if firearms analysis testimony is allowed in court, "the scientific criteria for validity as applied should be understood to require clearly reporting the error rates seen in the one appropriately designed black-box study"—estimated at 1 in 66, with a 95% confidence limit of 1 in 46. *Id.* PCAST further stated that testifying examiners should be required to disclose whether they were aware of other facts of the case that might influence their conclusions—i.e., whether their examination was blind. *Id.* at 113–14.

B. Courts Have Limited Examiner Testimony

Federal courts have increasingly scrutinized firearms examination methodology. To name but one example, a three-day *Daubert* hearing on the reliability of forensic toolmark examination in the District of New Jersey is widely cited by courts nationally. While the court ultimately admitted the evidence, it noted the concerns regarding the AFTE theory that individual characteristics" are unique to that tool and distinguish it from all other tools." *United States v. Cazares*, 788 F.3d 956, 988 (9th Cir. 2015); *see also United States v. Otero*, 849 F. Supp. 2d 425, 428 (D.N.J. 2012).

All sixteen of Mr. Fox's listed trial appearances are in Nassau County Supreme Court. His CV does not disclose any prior federal court testimony. Given this stated experience, it is appropriate to note that state courts, too, have questioned the validity of his methodology.

The Maryland Supreme Court's decision provides a framework for limiting unreliable aspects of firearms testimony while preserving probative elements. In *Abruquah v. State*, 296 A.3d 961 (Md. 2023), the Maryland Supreme Court became the first state supreme court to limit firearms examiner testimony based on reliability concerns. After a four-day evidentiary hearing, the court held that the methodology "did not provide a reliable basis" for an unqualified opinion that crime scene bullets were fired from the defendant's gun. *Id.* at 972.

The *Abruquah* court did not exclude firearms testimony entirely. Rather, it held that an examiner may testify "whether the patterns and markings on the crime scene bullets are consistent or inconsistent with the patterns and markings on the known bullets"—but may not offer "an unqualified opinion" of a match. *Id.* The court noted that error rates in studies were "in the low single digits," that one study found examiners classified the same bullet set differently between 20% and 35% of the time, and that "without the ability to examine other bullets fired from other firearms in the same production run as the firearm under examination, the record simply does not support that firearms identification can reliably eliminate all alternative sources." *Id.* at 977.

---

[1] D.P. Baldwin, et al. "A Study of False-Positive and False-Negative Error Rates in Cartridge Case Comparisons." Ames Laboratory, United States Department of Energy, Technical Report #IS-5207 (2014).

C. The AFTE "Sufficient Agreement" Standard Is Circular

The methodology employed by firearms examiners in the United States is governed by the Association of Firearm and Tool Mark Examiners ("AFTE") Theory of Identification. Under this theory, an "identification" is made when there is "sufficient agreement" of individual characteristics. Yet the standard provides no objective criteria for what constitutes "sufficient" agreement.

The court in *People v. Ross*, 129 N.Y.S.3d 629 (Sup. Ct. Bronx Cty. 2020) put it succinctly: "The AFTE standard is circular—an identification can be made upon sufficient agreement, and agreement is sufficient when an identification can be made." The *Ross* court, after conducting a full evidentiary hearing, concluded that "researchers in traditional scientific disciplines—including study design and research methodology, statistics and psychology—are unified in their view that toolmark identification is just a practice in search of a science and is not reliable." *Id.* at 630.

*Abruquah* questioned the validity of this methodology generally, but the *Ross* court's finding is even more relevant here: the Government's own expert, Jonathan Fox, testified at that very hearing as a witness for the prosecution. Mr. Fox was present when a New York State court concluded that the discipline he practices is "just a practice in search of a science." *Id.*

**The Government's Examiners Present Specific Reliability Concerns**

A. Jonathan Fox

Mr. Fox is a forensic examiner with the Nassau County Medical Examiner's Office. His educational background is in Criminal Justice (Bachelor of Science, Marist College) and Paralegal Studies (Associate Degree, Marist College). He holds no degree in any scientific discipline. His training in firearms examination was obtained through law enforcement—he is, in the parlance of the *Ross* court, a "cop who learned to use a microscope."

Three specific features of Mr. Fox's background warrant scrutiny:

*First*, Mr. Fox testified as a prosecution witness at the *Ross* Frye hearing in Bronx County—the very hearing at which a court concluded that his discipline is "a practice in search of a science." While *Ross* was decided under New York's Frye standard, the scientific criticisms the court credited are the same ones animating the federal *Daubert* inquiry: testability, error rates, standards and controls, and general acceptance outside the practitioners' own community.

*Second*, Mr. Fox's own published research undermines claims of certainty in his field. His 2010 AFTE Journal article on subclass characteristics in CCI Speer cartridge case heads acknowledges that *manufacturing marks can be mistaken for individual characteristics*—the very characteristics upon which source identification depends. *See* Jonathan Fox, Salvatore

Page **5** of **6**
*United States of America v. Akeem Chambers*, Case No. 23 Cr. 157 (JMA)
February 16, 2026

Lacova, Nicholas Mattia, "Subclass Characteristics on CCI Speer Cartridge Case Heads," *AFTE Journal*, 42, 3 (Summer 2010).

*Third*, Mr. Fox completed training in "Contextual Bias in Firearm and Toolmark Identification" in December 2020. He is therefore aware that non-blind examinations—where the examiner knows the expected result before beginning the comparison—carry a recognized risk of confirmation bias. If Mr. Fox confirmed National Integrated Ballistic Information Network ("NIBIN") leads knowing that the automated system had already flagged those casings as potential matches, his examination was non-blind and subject to the very contextual bias his own training identified as a scientific concern.

Finally, as noted, all sixteen of Mr. Fox's listed trial appearances are in Nassau County Supreme Court. The Government has not disclosed any prior federal court testimony by Mr. Fox. This case would appear to be his first time testifying in a federal proceeding—and the first time his methodology will be evaluated under the *Daubert* standard.

B.  Bryce Ziegler

Agent Ziegler is assigned to the FBI's Firearms/Toolmarks Unit. While the defense expects that Agent Ziegler may have broader federal court experience than Mr. Fox, the methodological concerns apply equally: the AFTE Theory of Identification he employs is the same subjective standard, the error rate data is the same, and the contextual bias risk is the same.

### Confirmation Bias and Non-Blind Verification

A 2020 study published in *Science & Justice* found that contextual bias occurs in non-blind peer-reviewed bullet and cartridge case comparisons, with the odds of disagreement between examiners approximately five times larger in blind versus non-blind procedures, and disagreement occurring in approximately 42.3% of blind comparisons versus 12.5% of non-blind comparisons. *See* Mattijssen, Erwin, et al., *Cognitive Biases in the Peer Review of Bullet and Cartridge Case Comparison Casework: A Field Study*, Science & Justice, 6, 4 (2020).[2]

In this case, the Government's firearms examiners were directed to specific cartridge casings by the NIBIN automated correlation system. They knew before beginning their microscopic examination that an algorithm had already flagged these casings as potential matches. This is the textbook definition of a non-blind examination. PCAST specifically identified this concern, recommending that testifying examiners be required to "disclose[] whether, when performing the examination, he or she was aware of any other facts of the case that might influence the conclusion." PCAST Report at 113–14.

---

[2] Available online at https://www.sciencedirect.com/science/article/abs/pii/S1355030619302977. Last accessed February 16, 2026.

Page **6** of **6**
*United States of America v. Akeem Chambers*, Case No. 23 Cr. 157 (JMA)
February 16, 2026

## Conclusion

In a RICO trial in which firearms comparison evidence is the connective thread linking predicate acts across multiple incidents, the Court's gatekeeping obligation under Rule 702 is at its apex. Mr. Chambers, Mr. Vazquez, and Mr. Shaw are not asking this Court to hold that firearms identification is junk science. They are asking the Court to hold the Government to the standard Congress codified in the 2023 amendment to Rule 702: that the testimony must reflect a reliable application of principles and methods, and that the proponent must demonstrate that reliability by a preponderance of the evidence.

A hearing is the appropriate mechanism to make that determination. And in requesting a *Daubert* hearing, the defendants specifically request the following relief:

1. Exclusion of firearms comparison opinion testimony under Rule 702, on the ground that the AFTE Theory of Identification has not been shown to reliably support source attribution conclusions; or, in the alternative,

2. Limitation on conclusion language, consistent with *Abruquah* and *Ross*, prohibiting the examiners from testifying that casings "were fired from" or "match" a particular firearm "to the exclusion of all other firearms," and permitting only testimony that markings are "consistent with" or "inconsistent with" those on known test-fired specimens; and

3. Required disclosure of limitations, including: (a) the known error rates from the Ames studies; (b) a statement that the AFTE "sufficient agreement" standard is subjective and provides no objective threshold; (c) disclosure of whether the examination was blind or whether the examiner was aware of the NIBIN lead results before conducting the microscopic comparison; and (d) disclosure of each examiner's individual proficiency testing results.

Thank you very much for your consideration in this matter.

Respectfully submitted,

Steve Zissou, Esq.
Glenn Obedin, Esq.
Xavier Donaldson, Esq.

SZ/jc